UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TAMMY RINEHART,

           **Plaintiff,**

    **v.**                              **Case No.: 2:14-cv-151**
                                                **JUDGE SMITH**
                                              **Magistrate Judge Kemp**

**PNC BANK, N.A.,** *et al.*,

           **Defendants.**

## OPINION AND ORDER

This matter is before the Court upon the Motion for Summary Judgment of PNC Bank, National Association ("PNC") (Doc. 57).  Plaintiff opposed PNC's Motion (Doc. 59) and PNC replied in support (Doc. 61).  This matter is now ripe for review.  For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This case concerns the employment relationship between Plaintiff Tammy Rinehart and PNC from August 9, 2010, until Rinehart took medical leave in January 2013.  (Doc. 2, Compl. at ¶¶ 6, 12).  Rinehart served as a peak time teller with PNC, a part time role that required her to work Fridays, Saturdays, and Mondays.  (*Id.* at ¶ 6; Doc. 63, Pl.'s Dep. at 49).  Trevor Black was the Branch Manager for the entirety of Plaintiff's employment at PNC.  (Doc. 2, Compl. at ¶ 7; Doc. 63, Pl.'s Dep. at 52).  Audra Hayes (née Timberman[1]) was the Teller Supervisor at PNC when Plaintiff began working at PNC in 2010, and Timberman remained in that position until her termination on December 21, 2012.  (Doc. 59-3, PNC Investigation Notes at PAGEID# 617).

---

[1] For ease of use, Mrs. Hayes will be referred to as Timberman.

The claims in this case related to a series of sex-based comments Timberman made to Rinehart in 2012, Rinehart's report of those comments to Black, and subsequent actions by Timberman and Black which are alleged to be retaliatory in nature.

The events leading up the Complaint in this case were catalogued by Plaintiff in a timeline she provided to PNC for PNC's investigation of Plaintiff's report of sexual harassment to Black. (*See* Doc. 57-3, Ex. 4 to Pl.'s Dep. ("Timeline")). The first event in the Timeline occurred in July 2012, but there are certain events which Plaintiff recalled at her deposition which predate the first events on the Timeline. The Court will chronologically set out each alleged comment and action by Timberman and Black that form the basis of this lawsuit.

The first incident underlying this suit occurred early in 2012, prior to the events set forth in the Timeline. Timberman brought in an iPad to sell to a coworker, Tamara Reynolds. (Doc. 63, Pl.'s Dep. at 70–71). Reynolds told Plaintiff the first thing she saw when she opened the iPad was some form of pornography. (*Id.*). Reynolds gave it to Doug Baylor, an investment officer who was knowledgeable about computers. (*Id.* at 51, 71; Doc. 62, Timberman Dep. at 61). Baylor took the pornography off of the iPad. (Doc. 63, Pl.'s Dep. at 71; Doc. 62, Timberman Dep. at 62). Plaintiff did not see the pornography nor did Timberman attempt to show Plaintiff anything on the iPad. (*Id.*).

Sometime in 2012 after the iPad incident, but before the events in the Timeline, Timberman returned from a vacation she had taken with her then-boyfriend, now husband, Will Hayes, Jed Stevens, and Mr. Stevens' wife. When Timberman returned to work, she told Plaintiff that Jed Stevens referred to Plaintiff as a "MILF"[2] and that he said Plaintiff's daughter was "hot." (Doc. 63, Pl.'s Dep. at 61). Shortly after the MILF comment, but still before the

---

[2] Plaintiff understood "MILF" to be a common acronym of the phrase, "Mother I'd like to 'F' word." (Doc. 63, Pl.'s Dep. at 80).

events in the Timeline, Plaintiff walked into a conversation between Timberman and two other tellers. (*Id.* at 65). The tellers, Laura West and Justina Frasier (née Tedrick), were looking at Timberman's phone and jumped up when Plaintiff walked in. (*Id.*). As West and Tedrick were exiting the area, somebody mentioned the word "threesome." (*Id.*). As Plaintiff also turned to leave, Timberman asked Plaintiff, "[w]hat do you think of that?" (*Id.*). Plaintiff asked "[t]hink of what?" and Timberman replied, "[t]hreesome." (*Id.*). At that time, Plaintiff did not believe she was being asked to participate in a threesome with Timberman and Hayes, but rather, that Timberman was thinking about participating in one for her boyfriend's benefit. (*Id.* at 106–07). Plaintiff replied, "If a man—I don't care what a man says, if a man tells you—or wants you to do something like that, I don't care what they say, I think they would lose respect for you." (*Id.* at 65).

The events in the Timeline began in July 2012 when Plaintiff and her daughter ran into Timberman and Will Hayes at a public pool. (Doc. 57-3, Timeline at 1). Apparently, it was the first time Hayes had seen Plaintiff and Plaintiff believes "this might have started with him." (Doc. 63, Pl.'s Dep. at 103). Later in July, Timberman sent a text to Plaintiff to ask if she would like to go to the pool again, noting that Will suggested Timberman and Plaintiff go together because Timberman did not like to go to the pool alone. (Doc. 57-3, Timeline at 1). Plaintiff decided to go to the pool with Timberman the next week. (*Id.*). Although the Timeline states that Timberman offered to revise Plaintiff's work hours while the two were at the pool, in her deposition, Plaintiff testified that Timberman stated that PNC was getting two new tellers and that maybe Plaintiff would not have to stay as late on Fridays. (*Id.*; Doc. 63, Pl.'s Dep. at 108). Timberman also told Plaintiff "the evaluations were coming up and that . . . Justina was good, [Plaintiff] was good, and Laura was okay." (*Id.*). The Timeline states that Timberman indicated

that Plaintiff's evaluation "is primarily based on [Timberman]'s input to Black."  (Doc. 57-3, Timeline at 1).  While at the pool, Timberman also expressed an interest in purchasing Plaintiff's home, which was for sale.  (*Id.*).

During the following few days, Timberman continued to discuss Plaintiff's home and stated that despite Timberman and Hayes' inability to obtain a home loan, that Timberman and Hayes still wanted to come see the home, "[b]ecause Will is driving me crazy, and I just want to get it over with."  (*Id.*).  Later that evening, Timberman and Hayes went to Plaintiff's home for about half an hour to look at the home.  (*Id.*).  While there, Timberman asked Plaintiff if the hot tub worked and stated "[w]e should have a party."  (Doc. 63, Pl.'s Dep. at 115).  After hearing the comment about the party, Plaintiff looked at Hayes, whose face turned red.  (*Id.*).  Just before leaving, Timberman again told Plaintiff that the arrival of new employees at PNC would change Plaintiff's schedule so that she could come in later on Mondays.  (*Id.*).  Plaintiff believed Timberman was meaning Timberman "was going to try to do things for [Plaintiff]."  (*Id.* at 116).

In September 2012, Timberman approached Plaintiff and in a joking manner, told Plaintiff that Hayes was obsessed with Plaintiff and that Hayes had asked Timberman to take a picture of Plaintiff.  (Doc. 57-3, Timeline at 1; Doc. 63, Pl.'s Dep. at 121).  Plaintiff stated that this comment did not bother her or flatter her.  (Doc. 63, Pl.'s Dep. at 122).  Later in the month, Timberman asked Plaintiff how much she weighed.  (Doc. 57-3, Timeline at 1).  Although the Timeline presents this question without context, Plaintiff explained in deposition that the tellers had been taking a weight loss supplement and the tellers were being competitive about their weight loss on this supplement.  (Doc. 63, Pl.'s Dep. at 124–25).

On October 5, 2012, Timberman sent a text to Plaintiff which included a picture of a woman and the quote, "I'm kind of a lady, but definitely more of a pervert."  (Doc 57-3, Ex. 5 to

Pl.'s Dep. at PAGEID# 407 ("Pervert text")).  Plaintiff felt that this text indicated that Timberman was interested in having a threesome with Hayes and Plaintiff.  (Doc. 63, Pl.'s Dep. at 126).  Plaintiff did not respond to the text.  (*Id.* at 129).  On another occasion in October, Timberman relayed a conversation that the other tellers had during one of Plaintiff's off-days.  (Doc. 57-3, Timeline at 2).  Timberman told Plaintiff that the discussion was that if Plaintiff lost any more weight, Plaintiff "would tip over because of the size of [her] boobs."  (*Id.*).  Plaintiff was humiliated but did not respond to the comment and worked the remainder of the day.  (Doc. 63, Pl.'s Dep. at 131).  Another day in October, a customer was at Timberman's window and was looking at Plaintiff and talking to Timberman.  (*Id.* at 132).  In response to something the customer said, Timberman yelled out, "No, those babies are real."  (*Id.*).

On another occasion in October, Timberman called Plaintiff back to the drive-through area to show Plaintiff a text Timberman received from Hayes.  The text said "Take a pic of Tammy's boobies and send it to me."  (Doc. 57-3, Timeline at 2).  Plaintiff responded that Hayes claims to be religious and that the text "was not cool."  (*Id.*).  Timberman agreed that it was not cool and that is why she did not show Plaintiff the picture of Hayes' privates that he also sent.  (Doc. 63, Pl.'s Dep. at 137; Doc. 57-3, Timeline at 2).  Plaintiff told Timberman that she was glad Timberman did not show her the photo of Hayes' privates and returned to her workstation.  (Doc. 57-3, Timeline at 2).

On October 19, 2012, Timberman sent a text to Plaintiff, stating "Will said come over tonight lol."  (Doc. 57-3, Ex. 6 to Pl.'s Dep. at PAGEID# 408 ("Come Over text")).  Timberman testified that the Come Over text was sent to a group of people to invite them over for dinner.  (Doc. 62, Timberman Dep. at 61–62).  The text the parties have presented to the Court shows no response from Plaintiff or any other recipients.  (*Id.*).  However, Plaintiff stated that she replied

to the text with something similar to "you have an ornery boyfriend." (Doc. 57-3, Timeline at 2). Timberman agreed. (*Id.*). Plaintiff believed that this text was an invitation for sexual relations and that the "lol" at the end was so that Timberman could play it off as a joke if Plaintiff did not come over. (Doc. 63, Pl.'s Dep. at 142).

After the invitation to come over, Plaintiff noticed a change in Timberman's behavior. The next day, Timberman worked in the drive-through even though she was not scheduled and was quiet, which was unusual for her. (Doc. 63, Pl.'s Dep. at 145). On October 22nd, Timberman asked Plaintiff why she was being so quiet and Plaintiff responded that she did not feel well. (Doc. 57-3, Timeline at 2). On October 26th, Plaintiff learned that Timberman was doing a surprise audit on Plaintiff and that Plaintiff had to complete a test that day. (*Id.*). Surprise audits were not unusual as they occurred several times a year, but Plaintiff found the timing odd. (Doc. 63, Pl.'s Dep. at 149). Plaintiff also notes that the tellers were given random tests but that she cannot recall the test that she received that day. (*Id.*).

On October 29, 2012, Plaintiff went into work and needed to finish a monthly report but Timberman was withholding some information from the report that prevented Plaintiff's completion of the report. (Doc. 63, Pl.'s Dep. at 152–53). After finding out that she would not have the reports she needed in time to finish them before the end of the month, Plaintiff reported her interactions with Timberman to Black the same day. (*Id.*). Plaintiff first told Black that he should call PNC's employee relations hotline or else that Plaintiff would call but that she came to him first out of respect. (*Id.*). Black initially hung his head, but after Plaintiff told him about the text messages and Timberman's comments about Plaintiff's breasts, Black assured Plaintiff that "he would be reporting these issues through the appropriate channels." (Doc. 57-3, Timeline at 2; Doc. 63, Pl.'s Dep. at 154). Timberman texted Plaintiff sometime around Plaintiff's report to

Black asking if Plaintiff was okay, noting, "U've been sad lately?"  (Doc. 57-3, Timeline at 2).  Plaintiff further alleges that later in the morning, Black was speaking to Randi Burkhart, a loan specialist, and Black said that he was going to have to say "boobies" to his manager.  (Doc. 57-3, Timeline at 2–3).  Burkhart laughed and looked at Plaintiff.  (*Id.*).  Black sent Plaintiff an email at 12:47 p.m. informing Plaintiff that he had "made his call and things were being initiated."  (*Id.* at 3).  He told Plaintiff to create the Timeline as best as she could, that he was sorry, and that Plaintiff would not "have to go through this again."  (*Id.*).  Black did begin a formal complaint of harassment with PNC's Employee Resource Information Center ("ERIC") and a tracking page for Plaintiff's Complaint was created on October 29, 2012.  (Doc. 66-1, Ex. 1 to Lewis Dep. at PAGEID# 1459 ("Investigation Summary")).  An initial call summary notes that Black relayed Plaintiff's report, specifically the text from Hayes asking for a picture of Plaintiff's breasts and that Timberman asked to get together outside of work.  (*Id.* at PAGEID# 1466).  Plaintiff did not report the issue with the iPad, the MILF comment, or the "threesome" comment.  (Doc. 63, Pl.'s Dep. at 175).  On November 1, 2012, Timberman sent a quiz to all of the tellers and marked questions as incorrect for Plaintiff which were not marked as incorrect for other tellers.  (Doc. 57-3, Timeline at 3).  There was no punishment, extra work, or other negative impact due to this quiz.  (*Id.*).

On November 5, 2012, Fran Lewis, an investigator with ERIC called Plaintiff to conduct a phone interview regarding her complaint against Timberman.  (Doc. 66-1, Investigation Summary at PAGEID# 1463).  Lewis also called Black and Timberman on the same day.  (*Id.*).  Black told Lewis that he had not had any problems with Timberman in the past but that she did send clips and pictures to other employees that she found funny.  (*Id.*).  Timberman denied telling Plaintiff that Hayes was obsessed with Plaintiff, that Hayes wanted a picture of Plaintiff's

breasts, or that Hayes had sent a picture of his privates. (*Id.*). Timberman also denied sending the Come Over text to Plaintiff and told Lewis that Hayes must have taken her phone when she was at home and sent that text. (*Id.*). Lewis decided that she needed to continue her investigation because Timberman denied Plaintiff's allegations. (Doc. 66-1, Lewis Dep. at 27). Lewis also told Plaintiff to report any retaliation whatsoever to Black. (Doc. 63, Pl.'s Dep. at 177).

However, Plaintiff continued to have problems with Timberman following the ERIC interviews. Plaintiff describes that she felt isolated and that the other staff members were hesitant to speak with her. (Doc. 57-3, Timeline at 4). Plaintiff also recalled a comment Timberman made about the way women over forty years old should wear their hear which she felt was directed at her. (*Id.*). On November 13, 2012, Plaintiff had just received a big deposit that put her drawer over the limit of what PNC considers appropriate.[3] (*Id.*). Before she could "sell" money to Timberman to get her drawer under the limit, Timberman yelled at Plaintiff to go work the drive-through, leaving Plaintiff open to reprimand if an audit or burglary occurred. (*Id.*). Plaintiff also began to have issues with Black around the same time. On November 10, 2012, Black visited Plaintiff in the drive-through where Plaintiff was working while another employee emptied Plaintiff's trash and bagged up her checks. (*Id.*). Later, on November 15, 2012, Black notified Plaintiff that a check from Plaintiff's station went missing on November 10th. (*Id.*).

On November 19, 2012, Timberman notified Plaintiff that she would be working on Black Friday, November 23, 2012—a day that Plaintiff had requested off repeatedly. (*Id.*).

---

[3] At the time, PNC required tellers to keep under $12,000 in their drawers to limit the impact a potential robbery would have. (Doc. 63, Pl.'s Dep. at 196–97). A teller gets rid of excess cash by "selling" cash to the Teller Supervisor. (*Id.*).

However, while Timberman had told her that she would receive the day off, Plaintiff admitted that she was on the schedule for that day.  (Doc. 63, Pl.'s Dep. at 206).  At one point, Timberman told her to take the day off, but that PNC would call her if they needed her.  (*Id.*).  Black and Timberman noted that two employees who transferred from other branches had recently started at the Byesville branch and that both had requested that day off with their prior branch.  (Doc. 64, Black Dep. at 32; Doc. 62, Timberman Dep. at 37–38).  Because the employees were tenured or full time employees, their requests were honored over Plaintiff's request.  (Doc. 64, Black Dep. at 32).  Timberman offered to let Plaintiff come in at noon so that Plaintiff could do some shopping with her daughter on Black Friday.  (Doc. 62, Timberman Dep. at 38).  Once at work on November 23, 2012, Timberman noted that one of Plaintiff's customer interview question scores was lower than another employee's score.  (Doc. 57-3, Timeline at 5).  Timberman also told the rest of the bank staff to email Black after each employee spoke to human resources. (*Id.*).  At another point, West and Tedrick were looking at something on a computer when one of them said, "[w]ell it's the truth," and looked at Plaintiff.  (Doc. 63, Pl.'s Dep. at 213–14). Plaintiff does not know what they were looking at on the computer or if it involved her.  (*Id.*). Later in the day, Plaintiff told Tedrick that a customer in the drive-through needed some cash in a different way.  (Doc. 63, Pl.'s Dep. at 215–16).  Timberman responded that Plaintiff should not single out Tedrick in front of customers.  (*Id.*).  Last, Plaintiff overheard Timberman and Tedrick tell Baylor that he needed to have their backs.  (*Id.* at 217).  Finally, Timberman told the staff that people were going to start receiving more back-end work starting in January.  (*Id.*).  On November 26, 2012, Timberman began sending emails to Plaintiff giving Plaintiff "friendly reminders" to put all of her work in the back before leaving each day.  (*Id.* at 217–18).  Black was copied on the emails.  (*Id.*).

In the meantime, Lewis continued to investigate the charges made by Plaintiff.  In the Investigation Summary, Lewis memorialized two attempts to call Plaintiff on November 21, 2012, and on November 27, 2012, and Plaintiff's failure to answer those calls.  (Doc. 66-1, Investigation Summary at PAGEID# 1465).  On November 28, 2012, Plaintiff requested an in-person meeting with Lewis which occurred in the Cambridge branch on December 5, 2012. (*Id.*).  On November 30th—before the in-person interview could be conducted—Timberman was in the drive-through with Lori Elliot and yelled out, "She did what?!" then looked directly at Plaintiff.[4]  (Doc. 57-3, Timeline at 6).  Later that day, Timberman changed Plaintiff's schedule to put her on drive-through for December 1—generally a busy day.  (*Id.*).  Plaintiff believes this was done to isolate her from the rest of the staff as one of the younger tellers generally staffed the drive-through on busy days.  (Doc. 63, Pl.'s Dep. at 223).

On December 5, Plaintiff met with Lewis in person and told her that the Come Over text occurred during work hours, an assertion that refuted Timberman's story about the text message. (Doc. 66-1, Investigation Summary at PAGEID# 1465).  On December 7, 2012, Timberman reiterated her version of the story.  (*Id.*).  However, later in the day, Timberman called Lewis back to retract the story about Hayes sending the Come Over text.  (*Id.*).  Timberman stated she checked her phone bill and believed it to be a day Hayes ordered pizza and asked the girls to come over.  (*Id.*).  On December 12, 2012, Lewis conducted interviews with Laura West, Justina Tedrick, and Doug Baylor by phone regarding Timberman and Plaintiff.  (*Id.* at PAGEID# 1465–466).  West confirmed that a customer asked how large Plaintiff's breasts were and if they were real but said Timberman tried to stop the customer from talking about it.  (*Id.*).  Only West

---

[4] Plaintiff believes this was a reference to a performance evaluation that each employee had to fill out about themselves.  (Doc. 63, Pl.'s Dep. at 221–22).  Plaintiff took longer than the other employees to fill out her evaluation.  (*Id.*).

recalled ever going to Timberman's home for pizza.  (*Id.*).  Lewis concluded that Timberman's claim about the Come Over text was unsubstantiated.  (Doc. 66-1, Lewis Dep. at 31).  Lewis made the decision to place Timberman on administrative leave on or about December 13, 2012. (Doc. 66-1, Investigation Summary at PAGEID# 1465).  PNC terminated Timberman on December 21, 2012.  (*Id.* at PAGEID# 1466).

Plaintiff continued to have issues with Black both during Timberman's administrative leave and after her termination.  On December 12th, during Timberman's leave, West asked Plaintiff about the investigation and Plaintiff responded that she would not talk about it until it was over.  (Doc. 57-3, Timeline at 6).  At that time, Black came out with his laptop, set up his computer, and said in a sarcastic voice, "[h]i Tam."  (*Id.*).  Plaintiff interpreted this as Black making sure she did not say anything about the investigation.  (Doc. 63, Pl.'s Dep. at 230). Shortly after, Black approached Plaintiff while Plaintiff was in the drive-through and requested to cut her hours for the following day because the branch was not as busy that day as he thought it would be.  (*Id.* at 230–31).  On December 22nd, Black changed the schedule in a way that only affected Plaintiff's schedule.  (*Id.* at 238).  Black then said, "[i]s that a cough I hear? Was the drive-through busy?"  (*Id.*).  Plaintiff felt that Black was being sarcastic and belittling.  (*Id.* at 239).  The revised schedule resulted in Plaintiff working alone on a Friday afternoon.  (*Id.* at 240–41).  As Black left the office that day, he said "Have a nice Christmas Eve off! Hope you get feeling better, Tammy."  (Doc. 57-3, Timeline at 7).

On December 26, 2012, Plaintiff was in an auto accident that put her out of work until December 30, 2012.  (Doc. 57-3, Timeline at 7).  Plaintiff filed a charge of discrimination with the EEOC on December 28, 2012.  (Doc. 57-9, First EEOC Charge).  At a follow-up visit for her car accident, Plaintiff's doctor extended her leave through January 3, 2013. (Doc. 63, Pl.'s Dep.

at 260–61).  On December 31st, Plaintiff texted Black, asking when he would like her to come back to work, noting "Oh and be easy ..Please dont ask me to work alone even for half hr. or in drive-through for a while. Let me know."  [sic throughout] (Doc. 57-3, Ex. 9 to Pl.'s Dep. at PAGEID# 409).  Black responded, "Let me get back to you on that, but it will probably be Wed[nesday] cause [sic] Lori and Justina have logged some serious hours." (Doc 57-3, Ex. 10 to Pl.'s Dep. at PAGEID# 410).  Plaintiff responded that her work "excuse extends through Wednesday," that she had an appointment Wednesday, and that she "was talking about Thursday." (*Id.* at PAGEID# 411).  Plaintiff was actually excused through Thursday.  (Doc. 63, Pl.'s Dep. at 269).  Black responded "Ok.  See ya at 8:45 on Thursday.  We'll keep it as light as possible."  (Doc 57-3, Ex. 10 to Pl.'s Dep. at PAGEID# 412).  Plaintiff went into work on Thursday despite her knowledge that her excuse went through Thursday.  (Doc. 63, Pl.'s Dep. at 272).  Upon her arrival, she told Black he needed to call human resources because her return to work date was Friday.  (*Id.*).  Black told her "[o]ops.  Sorry," and called human resources who confirmed that Plaintiff was off through Thursday.  (*Id.* at 272–73).  Black told Plaintiff that he told human resources, "[o]ops.  Sorry." (*Id.*).  Plaintiff did not go home at that time or otherwise speak to human resources about whether she should be at work that day.  (*Id.*).

On January 11th, Black informed the other tellers that Plaintiff could work in the drive-through all day.  (Doc. 57-3, Timeline at 8).  On January 14, 2013, Plaintiff told Black that she was up all night in pain and had to go to a doctor.  (Doc. 57-3, Timeline at 8).  Black texted Plaintiff in the morning asking if she could come in that day because Tedrick had called off of work.  (Doc 57-3, Ex. 10 to Pl.'s Dep. at PAGEID# 413).  Plaintiff responded that she still had to speak to the doctor and would let Black know.  (*Id.* at PAGEID# 414).  Plaintiff went into work at 1:00 p.m. with a doctor's note excusing her from working in the drive-through.  (Doc. 63, Pl.'s

Dep. at 291).  Plaintiff began a leave of absence for anxiety, stress, and depression on January 18, 2013, from which she has not returned.  (*Id.* at 294).  Plaintiff filed her second charge of discrimination based on retaliation for her report concerning Timberman with the EEOC on March 22, 2013.  (Doc. 57-10, Second Charge).

In May 2013, PNC offered Plaintiff a position at a different branch which Plaintiff declined because she did not feel ready to return to work.  (Doc. 63, Pl.'s Dep. at 300).  In August 2013, PNC notified Plaintiff that it would have to find a new employee to fill her position if she was unable to return to work by September 12, 2013.  (Doc. 57-8, Ex. 5 to Kindred Decl. at PAGEID# 554).  PNC informed Plaintiff that she could apply for another position at PNC and extended her leave until October 6, 2013.  (Doc. 57-8, Kindred Decl. at ¶ 20).  On January 14, 2014, PNC notified Plaintiff that the peak-time teller position was being eliminated at all branches.  (Doc. 57-8, Ex. 6 to Kindred Decl. at PAGEID# 557).

Plaintiff originally filed this suit in Guernsey County Common Pleas Court on January 21, 2014, before PNC removed the case to this Court.  (Doc. 1).  Plaintiff originally brought claims against Timberman and PNC for both hostile work environment and retaliation but did not specify under which laws the claims were brought.  (*See* Doc. 3, Compl.).  Plaintiff also brought a claim of intentional infliction of emotional distress.  Plaintiff has since dismissed the claims against Timberman and the intentional infliction of emotional distress claims.  PNC now moves for summary judgment on both of Plaintiff's remaining claims.

## II.    STANDARD OF REVIEW

PNC moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").  In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

## III.  DISCUSSION

PNC moved for summary judgment on Plaintiff's hostile work environment claims under 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02(A); and her retaliation claims under 42

U.S.C. § 2000e and Ohio Revised Code § 4112.02(I).[5]  PNC alleges that Plaintiff cannot make

out a prima facie case for a hostile work environment claim because the alleged harassment was

not sufficiently severe or persuasive and that Plaintiff's allegations do not provide a basis for

employer liability.  Plaintiff factually and legally rebuts PNC's arguments.  Additionally, PNC

argues that Plaintiff's retaliation claims fail because she fails to make out a prima facie case and

because PNC had legitimate non-pretextual reasons for its actions.  The Court will address each

of PNC's arguments in turn.

**A.       Hostile Work Environment Sexual Harassment**

As an initial matter, the Court notes that in Ohio, the elements and legal standards for

evaluating hostile work environment sexual harassment claims are the same under both federal

and state law.  *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).  Therefore,

to the extent Plaintiff brings claims under both state and federal law, the Court will consider

Plaintiff's Title VII and Ohio Civil Rights Act hostile work environment claims together.

"A violation of Title VII is established if discrimination based on sex has created a

hostile or abusive work environment."  *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th

Cir. 2008) (internal quotation marks omitted).  For Plaintiff to establish a prima facie Title VII

claim of hostile work environment sexual harassment, she must demonstrate: "'(1) she belonged

to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was

based on [her sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions

of employment and create an abusive working environment,' and (5) the employer is liable for

the harassment."  *Blackmon v. Eaton Corp.*, 587 F. App'x 925, 930 (6th Cir. 2014) (quoting

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).  The parties agree that for the

---

[5] PNC moved for summary judgment under both laws as Plaintiff did not specify under which she was bringing her claims.

purposes of this motion that Plaintiff has satisfied the first three elements of the prima facie case; therefore, the Court will focus on the fourth and fifth elements.

### 1.      Extent and Nature of the Harassment

PNC challenges the fourth element of the hostile work environment claim—whether Timberman's actions created an abusive working environment by altering the conditions of employment.   PNC argues the alleged harassment was not severe or pervasive enough because the incidents were sporadic, off-hand comments and Plaintiff did not subjectively view them as hostile.   Plaintiff argues that the incidents, when taken together, establish a prima facie case of severe and pervasive harassment.

In order for harassment to be actionable, the workplace must be "permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment."   *Hawkins*, 517 F.3d at 333 (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)).   "The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test."   *Id.* (internal quotations omitted).   Actionable harassment must be more than words with sexual content or connotations.   *Id.*   Courts look to the totality of the circumstances which include, but are not limited to the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance;" and "[t]he effect on the employee's psychological well-being . . . ."   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).   The Court "may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence."   *Hawkins*, 517 F.3d at 335.

16

Defendant essentially argues that individual instances in which Plaintiff believed Timberman was joking at the time of the incident or that certain incidents did not affect Plaintiff's work performance should not be considered when discussing whether the allegedly harassing conduct was severe or pervasive. This argument misses the mark because the Court must consider the "totality of the circumstances," "rather than analyze each incident as an independent event." *Harris*, 510 U.S. at 23; *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998). Notably, in the Sixth Circuit, courts have determined that "sexual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Hawkins*, 517 F.3d at 334 (quoting *Abeita*, 159 F.3d at 252).

In this case, Plaintiff has presented the Court with numerous sexual comments, remarks, and at least one invitation Timberman made directly to Plaintiff or in Plaintiff's presence over the course of at least four months. These include Plaintiff being called a MILF, Timberman telling Plaintiff that Timberman is a pervert, Timberman telling Plaintiff that Hayes was obsessed with her and wanted pictures of her on two separate occasions, and Timberman informing Plaintiff that Hayes wanted Plaintiff to come over to Timberman's home after work. Additionally, Plaintiff points to two separate incidents where Timberman made comments about the size of Plaintiff's breasts in front of the other PNC employees. Subjectively, Plaintiff noted that some of Timberman's comments were humiliating, that Plaintiff felt like Timberman was making comments every day that Plaintiff worked, and that she felt pressured to respond to Timberman's alleged sexual advance. (Doc. 63, Pl.'s Dep. at 131, 138, 142).

However, other cases in the Sixth Circuit cast doubt on whether the facts as presented by Plaintiff rise to the level of severe or pervasive. In *Bowman v. Shawnee St. Univ.*, the Sixth Circuit held there was no liability where Bowman was subject to four separate incidents over

four years by his supervisor, Jahnke.  220 F.3d 456 (6th Cir. 2000).  Bowman's claim was based on the following incidents: Jhanke rubbed Bowman's shoulder while Bowman was in Jahnke's office; Jahnke grabbed Bowman's buttocks and told him "she controlled [Bowman's] ass and she would do whatever she wanted with it;" Jhanke told Bowman he should come over to test out Jahnke's whirlpool with her; and that when Bowman was at Jahnke's house with his girlfriend to use Jhanke's pool, Jhanke told Bowman that he should come over to enjoy the pool without his girlfriend.  *Id.* at 459.  The Sixth Circuit upheld the district court's decision that the incidents were "not severe or pervasive."  *Id.* at 464.

In *Bowman*, the Sixth Circuit contrasted Bowman's case to the plaintiff's case in *Williams v. General Motors Corp.* in which the plaintiff was subjected to physical invasion by her male supervisor and repeated sexual comments which the Sixth Circuit found "crude, offensive, and humiliating."  *Williams*, 187 F.3d 553, 563 (6th Cir. 1999).  Additionally, the Sixth Circuit noted that one co-worker said "[h]ey, slut" in the workplace and that another said "I'm sick and tired of these fucking women" when a box was thrown at the plaintiff.  *Id.*

Ultimately, the Court finds that the facts in this case, viewed in the light most favorable to the Plaintiff are most similar to *Deters v. Rock-Tenn Co., Inc.*, 245 F. App'x 516, 524 (6th Cir. 2007).  In *Deters*, the supervisor never made physical contact with the plaintiff but did ask the plaintiff to have an affair.  Over three years, the supervisor bragged about his sexual prowess, bragged about an affair he was having with another employee's wife, and described the sexual acts he had in that affair.  *Id.* at 518.  The Court noted that the supervisor's "seemingly constant preoccupation with, and unwelcome communications about, his own sexual prowess, often while alone with the only female employee in the workplace, are, judged by any reasonable standard,

degrading, abusive and inexcusable." *Id.* at 524. Therefore, the court held that a triable issue of fact existed for the jury on the severe or pervasive element. *Id.*

Although the period of alleged harassment in this case did not last as long as the alleged harassment in *Deters*, there was a clear escalation during October 2012 that resulted in Plaintiff reporting Timberman's behavior. Viewing the facts in the light most favorable to the Plaintiff, the Court finds that a triable issue of fact exists as to the extent of the harassment and as to whether the harassment was severe or pervasive.

## 2.     Employer Liability

In evaluating the fifth element of the prima facie case, the Supreme Court has held that there is a vital difference if the alleged harassment was from a supervisor or a co-worker. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). If the harasser is a supervisor and the harassment "culminates in a tangible employment action, the employer is strictly liable." *Id.* at 2442 (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). However, an employer has an affirmative defense if no tangible employment action is taken. PNC may prove the defense by showing that: "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 133 S. Ct. at 2439 (2013) (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).

PNC disputes that Timberman was actually Plaintiff's supervisor because Timberman did not have the authority to hire, fire, or promote Plaintiff or have the authority to determine pay changes in Plaintiff's salary. PNC also argues that Timberman did not perform performance

evaluations.  Plaintiff argues that Timberman made suggestions for hiring decisions, that Timberman controlled Plaintiff's hours and work duties, and that Timberman had a significant amount of input on Plaintiff's performance evaluations.  Additionally, Plaintiff directs the Court to Ms. Timberman's job description which provided Timberman the authority to "(A) assign and direct work; (B) institute or recommend corrective action/discipline/discharge; (C) recommend salary increases; (D) conduct annual performance evaluations; (E) recommend promotions; (F) interview and select staff . . . (G) set or recommend new hire rates of pay/hours of work . . . ." (Doc. 59-2, Teller Banking Supervisor I Responsibilities at 1).  Based on the evidence presented that Timberman could conduct performance evaluations, select staff, assign work, recommend promotions and raises, and institute discipline and discharge, the Court finds that Plaintiff has presented sufficient evidence to show, at this stage, that Timberman was a supervisor both in name and in duties.

PNC last argues it has an affirmative defense because the harassment did not result in a tangible employment action.[6]  PNC argues that Plaintiff failed to take advantage of the corrective opportunities provided by PNC and that PNC took the proper steps to prevent and promptly correct the harassing behavior.  Plaintiff does not argue that she took advantage of the corrective opportunities PNC provides but argued that PNC's response to her complaint was neither prompt nor proper.

Even assuming that Defendant provided and executed a proper plan for circumscribing sexual harassment, Defendant has failed to prove the defense as a matter of law because Defendant must also set forth evidence that Plaintiff "unreasonably failed to take advantage of

---

[6] A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Vance*, 133 S.Ct. at 2442 (quoting *Ellerth*, 524 U.S. at 761).

the preventive or corrective opportunities that the employer provided." *Vance*, 133 S. Ct. at 2439 (2013) (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). It is generally accepted that if the Plaintiff completely fails to pursue a remedy, there is no employer liability. *Idusuyi v. State of Tenn. Dep't of Children's Servs.*, 30 F. App'x 398, 403 (6th Cir. 2002) (no employer liability where employee failed to notify the employer of the harassment and did not mention harassment to a single co-worker despite knowledge of employer's policies). A plaintiff's subjective opinion on the effectiveness of the employer's policy is not an excuse for delay or non-reporting. *Id.* at 404. The Court notes that delay in reporting can be considered unreasonable as a plaintiff's delay allows harassing behavior that could be addressed and remedied to continue. As the Supreme Court noted in *Ellerth*, "[t]o the extent limiting employer liability could encourage employees to report harassing conduct before it becomes severe or pervasive, it would also serve Title VII's deterrent purpose." *Ellerth*, 524 U.S. 742, 764 (citing *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 (1995)). Other courts have observed that "the *Faragher/Ellerth* defense encourages the prompt reporting of inappropriate behavior . . . ."[7] *Perry v. AutoZoners*, LLC, 954 F. Supp. 2d 599, 612 (W.D. Ky. 2013).

However, no court has set out a bright-line cut-off time for when a delay in reporting becomes an unreasonable failure to utilize an employer's corrective opportunities. The Sixth Circuit has held that a two-year delay in reporting harassing behavior is an unreasonable failure to pursue a remedy when the employee also rejected the employer's attempts to remedy the stress-producing conditions. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008).

---

[7] The Court notes that there is an inherent conflict between the purpose behind the defense—encouraging employers to have strong anti-harassment policies and procedures—and the defense itself. The conflict is that the defense is not available to an employer when the employer receives a timely complaint under its policies and properly addresses the issue. Thus, if an employer has an effective process, a supervisor starts harassing a subordinate, the subordinate reports the harassment, and the employer swiftly addresses the harassment, the system worked as intended but there would still be liability.

A sister-court in this district has held that it was up to a jury to determine if a three-week delay was unreasonable where the employee had attempted to resolve the issue personally "by asking and demanding that [the supervisor] stop his inappropriate conduct." *Perry*, 954 F. Supp. 2d at 611; *see also Perry v. AutoZone Stores, Inc.*, 608 F. App'x 388, 389 (6th Cir. 2015) (affirming jury's finding that affirmative defense did not apply).

Plaintiff does not argue against Defendant's assertion that she unreasonably failed to report Timberman, but her failure to argue this point does not mean the Court may or should automatically find that the affirmative defense applies. Defendant argues that Plaintiff's delay in reporting the harassment until it was over shows that she unreasonably failed to take advantage of PNC's anti-harassment policies. It is undisputed that the last sexually-tinged comment Timberman made to Plaintiff occurred on October 20th and that Plaintiff did not formally complain about Timberman's behavior until October 29th. Additionally, Plaintiff noted that upon receipt of the Pervert text on October 5th, Plaintiff felt like Timberman was seeking out a threesome or some other sexual encounter. When she ultimately complained of Timberman's behavior to PNC, Plaintiff did not inform PNC of the three events which occurred prior to the events in the Timeline. Notably, these events involved Plaintiff being called a MILF and Timberman asking how Plaintiff about "threesome." However, that a jury may find Plaintiff's delay in reporting Timberman's behavior unreasonable does not mean that the affirmative defense absolutely applies. This is a close case where Plaintiff has presented no evidence that she told any of her co-workers or bosses about Timberman's conduct or that there was any valid reason for her delay. Further, based on the evidence as presented at this stage, there is no dispute the sexual advances of Timberman ended when Plaintiff made a complaint to Black. Had Plaintiff reported Timberman after the Pervert text, perhaps PNC could have ended Timberman's

behavior before the behavior became severe or pervasive. Ultimately, even after PNC terminated Timberman, Plaintiff did not take advantage of PNC's offer to relocate her to another branch because Plaintiff alleges that she was not ready to return to work. (Doc. 63, Pl.'s Dep. at 300). In light of the facts presented, and viewed in the light most favorable to the Plaintiff, the Court finds that it will be a jury's decision whether Plaintiff's delay in reporting constitutes an unreasonable failure.

**B.      Retaliation Claim**

Defendant next argues that summary judgment is appropriate on Plaintiff's retaliation claim because Plaintiff cannot set forth a prima facie case or, in the alternative, that Plaintiff cannot demonstrate pretext. Specifically, Defendant argues that no adverse action was taken against Plaintiff. Plaintiff argues that Plaintiff's schedule was changed to give her more difficult duties and undesirable hours, that she was forced to work more days to get her hours than she was before her complaint, and that she was denied an accommodation for injuries sustained in a car crash.

The prima facie case for a Title VII retaliation claim consists of four elements:

"(1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment."

*Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citing *Garner v. Cuyahoga Cty. Juvenile Ct.*, 554 F.3d 624, 639 (6th Cir. 2009)). Defendant specifically challenges element three—that an adverse employment action was taken or that Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor.

An adverse employment action is "a materially adverse change in the terms of her employment." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  Although a reassignment without salary or work hour changes is not normally an adverse action, it may be if it "constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'"  *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), aff'd sub nom. 548 U.S. 53 (2006) (citing *Kocsis* 97 F.3d at 886); *see also Wade v. Automation Pers. Servs.*, Inc., 612 F. App'x 291, 300 (6th Cir. 2015) (shift change by one hour is not materially adverse).

The Court agrees with Defendant that the incidents charged by Plaintiff to be adverse actions do not constitute adverse actions when each is considered as a single, independent event. However, the standard set forth by the Sixth Circuit specifically allows the Court to consider all of the events together to determine whether "the employee was subjected to severe or pervasive retaliatory harassment by a supervisor."  *Fuhr*, 710 F.3d at 674 (citing *Garner*, 554 F.3d at 639).

There are a few minor incidents of which Plaintiff complains which were not fully discussed in the motions.  Specifically, these include the incident where a check went missing from Plaintiff's area and that Timberman yelled at Plaintiff to tend to the drive-through when Plaintiff had just received a large deposit.  (Doc. 57-3, Timeline at 4–5).  Both parties discuss Plaintiff's complaint that Plaintiff was required to work on Black Friday in 2012 after she had been promised the day off.  Plaintiff admitted that she was never guaranteed the day off and that Timberman told Plaintiff that Plaintiff would be called in PNC needed Plaintiff to come in. (Doc. 63, Pl.'s Dep. at 206).  Black and Timberman both testified that Plaintiff had to work because the two new employees had already requested the day off.  (Doc. 64, Black Dep. at 32;

Doc. 62, Timberman Dep. at 37–38).  However, Plaintiff points to that week's schedule which shows that West, one of the new employees, was scheduled to work that day.  (Doc. 59-4, November Schedules at PAGEID# 619).

Plaintiff next argues that Timberman changed Plaintiff's schedule to require Plaintiff to work until 5:00 p.m. on Fridays following Plaintiff's complaint and that the change constitutes an adverse action.  In support, Plaintiff directs the Court to Exhibit 4, two schedules which Plaintiff argues show the changes to her schedule.  However, the first schedule shows Plaintiff scheduled on Friday, November 30th from 7:45 a.m. to 2:45 p.m.  (Doc. 59-4, November Schedules at PAGEID# 619).  Similarly, for the entire month of November, there is no Friday on which Plaintiff was scheduled past 2:45 other than Black Friday.  (*Id.* at 620).  Plaintiff's timesheets from the period show that she worked until 2:45 on each Friday of the month of November other than November 23rd.  (Doc. 57-5, Ex. 3 to Black Aff. ("Timesheets") at PAGEID#s 461–65).  Additionally, there is no other day where Plaintiff's timesheets show she clocked out after 5:00 p.m. (*See id.*).  Plaintiff's next alleged adverse action is that Timberman required Plaintiff to work the first day of the month in the drive-through.  Plaintiff stated that Timberman would usually assign the first of the month to a younger teller because the first day of the month was busy.  (Doc. 57-3, Timeline at 6).  Defendant generally argues that working the drive-through was part of Plaintiff's job description and that she worked in the drive-through frequently and whenever it was necessary.  The schedule for November 1, 2012, notes that originally, Plaintiff was scheduled to work as a lobby teller but that Timberman crossed out the marking for lobby teller, and changed the schedule to "RDU," an abbreviation for the drive-through.  (Doc. 59-4, November Schedules at PAGEID# 619).

Plaintiff argues that after Timberman was fired, Black "adjusted my schedule forcing me to work nearly every day to get in my hours by working as little as 2 or 3 hours a day." (Doc. 60, Pl.'s Aff. at ¶ 16). However, Plaintiff does not explain how often this occurred and evidence presented by the Defendant shows that there is one week of Plaintiff's time cards which shows she had to work one extra day to make her hours for the week, the week of December 10, 2013. (*See* Doc. 57-5, Timesheets). Plaintiff expounded on her hour allotment for that week in her deposition, noting that Black approached Plaintiff on Tuesday, December 12th, and told Plaintiff that he needed to cut her hours for Wednesday, December 13. (Doc. 63, Pl.'s Dep. at 231). When Plaintiff asked why, Black responded, "I thought we'd be busier than this." (*Id.*). Black explained that this was because an employee left PNC. (Doc. 64, Black Dep. at 43). Although Plaintiff makes an off-hand reference to this change causing increased child-care costs, there is no citation to the record which supports this assertion. (*See* Doc. 59, Pl.'s Opp. at 16).

Last, Plaintiff argues that Black forced her to return to work before she had permission from her doctor and that he failed to accommodate her restrictions. But these incidents are not probative of any retaliatory conduct. The text messages exchanged between Plaintiff and Black indisputably show that Plaintiff asked when she could return to work, told Black she was talking about the day before her official return to work, and that Black told her that the bank would "keep it as light as possible." (Doc 57-3, Ex. 10 to Pl.'s Dep. at PAGEID# 412). Further, the only time Black required Plaintiff to work outside of her requested restrictions was on January 12th, eight days after she had already returned to work without any medical restrictions. (Doc. 57-3, Timeline at 8). Plaintiff also emphasizes a day when Black asked Plaintiff to come in after a doctor's appointment because another employee had called off. (*Id.*). However, Black approved Plaintiff's time off that day for the doctor's appointment and the text message Plaintiff

responded to that day did not demand or require that she come to work.  (Doc 57-3, Ex. 10 to Pl.'s Dep. at PAGEID# 412).  Once she got to work, Plaintiff provided Black with a medical restriction and another PNC employee helped Plaintiff work for the remainder of the day.  (Doc. 57-3, Timeline at 8; Doc. 63, Pl.'s Dep. at 290, 293).

After the review of the incidents which occurred after Plaintiff's complaint, the Court finds that even when viewing the allegations in the light most favorable to the Plaintiff, the incidents do not amount to severe retaliatory harassment.  The Court finds the allegations in this case similar to those in *Akers v. Alvey*, in which a plaintiff alleged retaliatory harassment following a sexual harassment complaint that consisted of her supervisor "refusing to speak to her, instructing other employees not to associate with her, withholding her mail and inter-office memoranda, and criticizing the way she handled her cases."  338 F.3d 491, 494 (6th Cir. 2003). The Court found that the behavior fell in-between some of the more outrageous cases in the circuit, but somewhere beyond "simple teasing" or "offhand comments."  *Id.* at 499.  However, because the harassing behavior only occurred over a two-week period, was relatively mild, and the employer had sent out a directive prohibiting retaliation, the Court found no employer liability.  *Id.*  In this case, while the employer did not send out a directive prohibiting retaliation, PNC did notify Plaintiff that she should report "any retaliation whatsoever" to Black immediately.  (Doc. 63, Pl.'s Dep. at 177).

This case is also similar to *Broska v. Henderson*, in which the plaintiff alleged harassment following a report of discrimination.  70 F. App'x 262, 264 (6th Cir. 2003).  The alleged retaliation involved his supervisors reviewing his work more intensely and critically than they were of others but notably, did not involve any harassment outside of work, physical intimidation, or verbal abuse.  *Id.* at 270.  The plaintiff admitted that supervision by his bosses

was part of his job and thus the court found that the allegations were not sufficiently hostile and abusive as to constitute an abusive working environment.  *Id.*  (quoting *Harris*, 510 U.S. at 21). In yet another similar case, this Court found that alleged harassment was not severe or pervasive when an employee had requests for formal training denied, was moved to a new department, was verbally warned for poor customer service, and the employee was played on a performance improvement plant.  *Gentry v. Wells Fargo*, No. C-1-04-29, 2006 WL 2319987, at *5–6 (S.D. Ohio Aug. 8, 2006).  The Court finds that the retaliation in this case was minor compared to other cases which found retaliatory harassment, that PNC told Plaintiff to report any retaliatory behavior immediately, and that much of the complained-of conduct involved Black and Timberman requiring Plaintiff to perform tasks or work times that were within her job duties. Accordingly, summary judgment as to Plaintiff's retaliation claim is **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.  The Clerk shall **REMOVE** Document 57 from the Court's pending motions list.  Previously, the parties were open to mediate this case.  In light of this decision, settlement discussions are encouraged and the parties shall contact Magistrate Judge Kemp to arrange for participation in an upcoming Settlement Week or schedule a Mediation/Settlement Conference outside of a designated Settlement Week.

**IT IS SO ORDERED.**

__*/s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**

28